# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                      No.  CR 04-1979 MV

JOSHUA BEGAY,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant's timely Sentencing

Memorandum, filed January 26, 2006 **[Doc. No. 46]**.[1]  The Court, having considered the motion,

brief, relevant law and being otherwise fully informed, ruled at Defendant's sentencing hearing

that Defendant's advisory Guidelines sentence would be reduced pursuant to *United States v.*

---

[1]  The government failed to file a timely response.  Seven days after the filing deadline passed, and only after being contacted by the Court, the Assistant United State Attorney filed a Motion to Extend Time for Filing Response to Sentencing Memorandum, filed January 26, 2006 and Motion to Continue the Sentencing Date [Doc. No. 47] and a Sentencing Memorandum [Doc. No. 48].  The government's sentencing Memorandum contained critical errors. Specifically, at various points the government's Memorandum refers to incorrect paragraph numbers in Defendant's presentence report and misstates Defendant's name, the date of the sentencing hearing, the applicable Guidelines range (forty-six to fifty-seven months rather than the correct range of thirty-three to forty-one months), Defendant's criminal history score (III rather than the correct category of I), Defendant's base offense level (21 rather than the correct category of 20).  On the first page of its Memorandum the government asks the Court to impose a sentence "at the top of the Guideline range" and five sentences later the government requests a sentence "at the middle of the guideline range."   On page 8 the government requests a sentence in the middle of the Guidelines range in recognition of, among other things, "the defendant's criminal past." However, the Presentence report, which was undisputed, indicates that Defendant has had zero prior arrests, convictions, or juvenile adjudications and is therefore in the lowest criminal history category.  The government's response is largely boilerplate sentencing language; its few sentences that contain analysis arguably related to this case were non-responsive to Defendant's Sentencing Memorandum.  In short, the government's briefing in this case was unreliable, untimely, and unacceptable.

*Booker*, 543 U.S. 220 (2005).  The Court now sets forth the basis for its prior ruling in this Memorandum Opinion.

## **BACKGROUND**

On August 4, 2004, Defendant, his wife, and two-year-old daughter were driving through a housing development in Crystal, New Mexico.  They were in a white Toyota truck driven by Defendant's wife, Stacey Begay.  Defendant was sitting in the passenger seat and his daughter was sitting in the back seat.  They were returning to their home in Sawmill, Arizona from a trip to Farmington, New Mexico.  Defendant and his family had stopped in Crystal so that Defendant's daughter could visit her young cousins, who live there, along with Defendant's grandparents, uncles, aunts, and cousins.  Defendant's relatives live in houses near the home of Ricky Gatewood Jr.[2], the victim in this case.

Defendant and his family stayed at their cousins' house for only twenty minutes because the young cousins whom they intended to visit were not home.  With Defendant's wife driving the truck, Defendant and his family headed out of the subdivision.  Before getting far, they heard someone yelling.  They thought their cousins were calling for them to return, so Defendant's wife turned around the truck to head back.  As they were turning around, Defendant saw Ricky Jr. on his front porch.  Ricky Jr. was holding a beer can and pointing at Defendant while yelling profanities and making belligerent comments indicating that he wanted to fight with Defendant and that Defendant should get out of his truck.

---

[2] I refer to Mr. Gatewood as Ricky Jr. in order to distinguish him from his son, Ricky Gatewood, III, and his brother, Manuel Gatewood.

Defendant was aware of the problems that his relatives had had with Ricky Jr. in the past. Specifically, Ricky Jr. and his brothers had robbed Defendant's grandparents and, on another occasion, had beaten Defendant's aunt and uncle.  As a result, at various times, Defendant's relatives have had restraining orders in effect (through the Navajo Tribal Court) against the victim.

In response to Ricky Jr.'s taunts, Defendant told Ricky Jr. he would not fight and that Ricky Jr. should go inside and drink his beer.  Defendant attempted to laugh off Ricky Jr.'s belligerent comments, which only made Ricky Jr. more aggressive.  He came within fifteen feet of Defendant's truck.  The exchange between Ricky Jr. and Defendant upset Defendant's young daughter, who was sitting in the back seat of the truck.  She unbuckled her car seat and climbed into the front seat and onto her father's lap.   Ricky Jr. continued shouting, and he came off of his porch toward Defendant's truck.  At this point, Defendant told his wife that she should drive away.  Before they had the chance, Defendant dropped the beer can he had in his hand on the ground, stomped it with his foot, picked it up and threw the can at Defendant's open window. Defendant's daughter, who was standing on the floor panel near her father and in front of the open window, suddenly screamed.  Her reaction led Defendant and his wife to believe that the beer can had hit her on the head.  At this point, Defendant jumped out of the truck to confront Ricky Jr., and the fight at issue in this case ensued.

Defendant removed a folding knife from his pocket and approached Ricky Jr.  When approached, Ricky Jr. raised his arms, and attempted to hit Defendant with his left fist.  Defendant stabbed Ricky Jr. with a knife, which entered Ricky Jr.'s chest below his left armpit.  Ricky Jr. fell to the ground.  Ricky Jr. got up from the ground and hit Defendant in the face. Ricky Jr. again got

up to continue the fight.  At some point during the scuffle, Defendant stabbed Ricky Jr. a second

time.  Ricky Jr.'s brother, Manuel Gatewood, who was in the house, heard the yelling and ran

outside.[3]  Ricky Jr.'s three-year-old son, Ricky Gatewood III, followed.

Accounts from the various participants about what happened at this point vary.  Ricky Jr.

told police officers that the three-year-old boy went near Defendant, Defendant grabbed him, put

the knife to the boy's right cheek, and moved backwards toward his truck, using the boy like a

shield.  Defendant then let go of the boy, got into his truck, and left the area.  Ricky Jr.'s version

of events, however, contrasts significantly from the evidence presented at the sentencing hearing.

Defendant's and his wife's credible testimony established that when Manuel and the boy came

outside, the boy ran directly to Defendant and grabbed Defendant's left leg and held it tightly,

trying to wrestle him.  Defendant, who is right-handed, was holding in the knife in his right hand,

which he kept raised.  Defendant was cornered by Ricky Jr. and Manuel, and he attempted to

back up toward his truck.  With his free left hand, Defendant picked up the boy by his hood in an

effort to remove the child from his leg and throw him to the side, out of harm's way.  Defendant

never intentionally held the knife near the boy's face.  Defendant was focused on getting the child

out of the way of the fight, which appeared to be escalating.  Ricky Jr. and Manuel were closing

in on Defendant, and Ricky Jr. was reaching into his pocket for what the Defendant assumed was

a weapon and Manuel was brandishing a kitchen knife.

As Manuel charged toward Defendant,  Defendant struck him with the knife, inflicting a

superficial cut to Manuel's hand.  There is some evidence that, at this point, Ricky Jr. again began

_____

[3]  Up until about five minutes before the start of the fight, Manuel Gatewood had been
sitting on the porch with Ricky Jr. and Ricky III.  Manuel went inside to use the bathroom.

to fight with Defendant.  Eventually, Defendant backed away, got into his truck, and left the area with his family.  The incident lasted approximately five or six minutes.

After the incident, Ricky Jr. was taken to Fort Defiance Indian Hospital where he was treated for his injuries.  Medical records show that, upon his arrival, he was alert and in stable condition.  He had two stab wounds on the left side of his chest, which were one-half-inch and a one-quarter-inch in size.  Ricky Jr. was treated for a pneumothorax and a hemothorax.  The stab wounds were sutured and he was released four days later.  Subsequent X-rays showed no further problems.

Defendant pleaded guilty to Count III of the Indictment charging him as follows:

On or about the August 4th, 2004, within the exterior boundaries of the Navajo Reservation, in the State and District of New Mexico, the defendant, Joshua Begay, an Indian, did unlawfully and knowingly assault Ricky Gatewood, an Indian, such assault resulting in serious bodily injury.  In violation of 18 U.S.C. §§ 1153 and 113(a)(6).

The government subsequently dismissed Count I (assault on Ricky Gatewood, with a dangerous weapon (a knife), with intent to do bodily harm, in violation of 18 U.S.C. §§ 1153 and 113(a)(3)) and Count II (assault on Manuel Gatewood, with a dangerous weapon (a knife), with intent to do bodily harm, in violation of 18 U.S.C. §§ 1153 and 113(a)(3)).  In his acceptance-of-responsibility statement, Defendant states the following:

I accept full responsibility for my crime.  I am sorry that the event came to the point where I injured Mr. Gatewood.

In his Sentencing Memorandum, Defendant argued that in consideration of the factors set forth in 18 U.S.C. § 3553(a) he should be sentenced to a minimum term of incarceration and placement in a halfway house or home detention, followed by supervised release.

The Court held Defendant's sentencing hearing on March 2, 2005.  Many members of Defendant's family attended the hearing, and Defendant, his wife, and his grandmother, Margaret Keith, all provided sworn testimony.  After hearing the evidence, the Court sentenced Defendant outside the advisory Guidelines range pursuant to *Booker*.

### **DISCUSSION**

In *United States v. Booker*, 124 S. Ct. 738 (2005), the Supreme Court held that the Federal Sentencing Guidelines ("Guidelines") violated the Sixth Amendment.  To remedy the constitutional problem, the Court excised 18 U.S.C. § 3553(b)(1), the provision of the Sentencing Reform Act that made the Guidelines mandatory, along with the appellate review provisions of 18 U.S.C. § 3742(e) and any cross-references to section § 3553(b)(1).

After *Booker*, a district court must consider the guideline range, *see* 18 U.S.C.A. § 3553(a)(4) (Supp. 2004), but must also consider the other sentencing directives set forth in § 3553(a). Specifically, § 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."  Section 3553(a)(2) states that a sentence must:  (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Section 3553(a) further directs sentencing courts to consider:  The nature and circumstances of the offense and the history and characteristics of the defendant;  the kinds of sentences available; the need to avoid unwanted sentencing disparities among defendants with

similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

In all cases, to determine a reasonable sentence, a court first will determine the advisory Guidelines range and then examine departure arguments and factual objections to the Presentence Report ("PSR").  Next, the court will analyze the sentencing factors set forth in § 3553(a) and determine an appropriate sentence.

## I.  Advisory Guidelines Range

The PSR assigned Defendant a base offense level of fourteen pursuant to U.S.S.G. § 2A2.2(a).  The PSR also assigned a four-level increase because Defendant used a dangerous weapon (a knife), pursuant to §2A2.2(b)(2)(B).  Finally, the PSR assigned a five-level increase because the victim suffered serious bodily injury.  Specifically, the victim sustained two stab wounds to the left side of his chest, which resulted in pneumothorax and hemothorax.  I determined that these adjustments brought Defendant's Adjusted Offense Level to twenty-three.

Defendant received a three-level downward adjustment for acceptance of responsibility, bringing Defendant's total offense level to twenty.  Defendant has zero criminal history points, which establishes a criminal history category of I.  The resulting guidelines imprisonment range is thirty-three to forty-one months.

## II.  Imposition of Sentence

After determining Defendant's advisory Guidelines range, I considered the sentencing factors set forth 18 U.S.C. § 3553(a) and imposed a sentence of six months of home confinement with electronic monitoring.  In this Memorandum, I explain how I determined that this was the proper sentence to impose in this unique case.

### A.    The nature and circumstances of the offense

Defendant's offense was serious, primarily because of the injury inflicted on Ricky Jr. However, Defendant's culpability was mitigated by the victim's wrongful conduct, a fact that the government acknowledged at the hearing.  Sentencing Tr. 75-76, Mar. 2, 2006.  Defendant's knowledge of the victim's prior violent and criminal acts against Defendant's family members, combined with the victim's wrongful conduct against Defendant and Defendant's family on the day the offense occurred, significantly provoked and escalated the offense.  Initially, Defendant declined to engage with the victim despite the victim's threats and taunts.  Defendant succumbed to the taunts after he reasonably believed that the victim attacked Defendant's young daughter. Defendant overreacted in the heat of the moment.  After considering the information provided to me prior to the sentencing hearing, as well as the evidence presented at the hearing, I find that the Defendant's actions toward the child were not violent nor threatening but rather an attempt to remove the child from danger.

Additionally, I note that, unlike many of the cases of aggravated assault that come before me, this case does not involve the defendant's excessive and irresponsible use of alcohol. Defendant, who had consumed no drugs or alcohol that day, was not intoxicated at the time of the offense.  The victim, however, was drunk, which appears to have fueled his belligerence that sparked the confrontation.  Finally, in speaking with law enforcement officers and long before he was charged, Defendant immediately took responsibility for the harm he did to Ricky Jr., and expressed remorse.

### B.    The history and character of the defendant

Defendant is a 23-year-old Navajo man who was born in Fort Defiance, Arizona.  He has lived all of his life on or near the Navajo reservation.  He was raised by his mother until age ten, when his mother married his stepfather.  Defendant's stepfather was an alcoholic who physically abused Defendant until Defendant was approximately thirteen years old.  At that point, Defendant's stepfather stopped using alcohol and Defendant reports that he now has a good relationship with his stepfather.

Defendant is married to Stacey Begay.  They have two children, aged three years and six months.  Defendant and his wife and children live with Defendant's mother.  Defendant has maintained employment while on supervision, at times working two jobs, and has a good work history.

Defendant's complete lack of criminal history is notable, and unique when compared with the backgrounds of most defendants who come before me for sentencing for aggravated assault. Prior to this case, Defendant had no contact with law enforcement, either as a juvenile or as an adult.

**C.** **The needs of the public and any victims of the crime, and the need to afford adequate deterrence and the need to reflect the seriousness of the offense, promote respect for law, to provide for just punishment for the offense, and avoid unwarranted sentencing disparities**

As detailed above, the particular circumstances of this case are unique and are unlikely to recur.  Based on the information contained in the presentence documents and the evidence presented at Defendant's sentencing hearing, I am convinced that this offense was an aberrant act by Defendant and I conclude that he does not pose a danger to the public.[4]  Nor do I believe he

---

[4] The government agreed with this assessment.  Sentencing Tr. 76:22, March 2, 2006.

poses a danger to Ricky Jr. or Manuel Gatewood.  Defendant has had no subsequent contact with Ricky Jr., and since the offense Defendant has moved away from New Mexico and now lives with other family members in Phoenix, Arizona.

I am required to impose a sentence that properly reflects the seriousness of the offense and provides for just punishment.  In this case, the circumstances of the offense and the character of the Defendant led me to conclude that a sentence of home confinement with electronic monitoring is the proper punishment.

I take this opportunity to note that the probation officer at Defendant's sentencing hearing, who was previously employed as a New Mexico state probation officer, informed me that a defendant like the one in this case would, more likely than not, have received a sentence of eighteen months probation and possibly a deferred sentence had he been sentenced in state court rather than federal court.  Because this offense occurred in Indian Country, however, it was prosecuted in federal court.  Hence, Defendant is subject to the Federal Sentencing Guidelines, and is therefore exposed to a much higher sentence than one he would have faced in state court.

This problem is not unique to this Defendant; it arises repeatedly for the Native Americans[5] who appear in federal court for sentencing pursuant to United States Sentencing Guidelines § 2A2.2 (Aggravated Assault).  Native Americans, who are the individuals most likely to be charged with this offense in federal court, suffer the greatest impact of this federal-state sentencing disparity.  *See* UNITED STATES SENTENCING COMMISSION, NATIVE AMERICAN ADVISORY GROUP, REPORT OF THE AD HOC ADVISORY GROUP ON NATIVE AMERICAN

---

[5] The classification that a defendant is an "Indian" is a political, as opposed to racial, classification.  *United States v. Antelope*, 430 U.S. 641, 645-646 (1977).

SENTENCING ISSUES TO THE UNITED STATES SENTENCING COMMISSION (Nov. 4, 2003) at 8

(hereinafter "Report"), *available at* http://www.ussc.gov/NAAG/NativeAmer.pdf.  And this

sentencing disparity impacts a great number of Native American defendants:  Sentencing

Commission data show that when a Native American faces a federal sentencing judge in New

Mexico, nearly 30 percent of the time it will be subsequent to a conviction for Aggravated assault.

*See* U.S. Sentencing Comm'n, Data Extract by Senior Research Associate Kevin R. Blackwell,

March 16, 2006, Table "Native Americans Sentenced Under § 2A2.2, January 12, 2005 through

March 16, 2006" (hereinafter "March 16 2006 U.S.S.C. Data Extract").

         The United States Sentencing Commission has taken action to correct the fact that Native

American defendants are treated more harshly by the federal sentencing system than if they were

prosecuted by their respective states.  UNITED STATES SENTENCING GUIDELINES MANUAL,

SUPPLEMENT TO APPENDIX C, AMENDMENT 663 (effective November 1, 2004) (hereinafter

"Amendment 663").  Unfortunately, the disparity persists.  March 16 2006 U.S.S.C. Data Extract.

         In response to complaints from various sources about the discriminatory impact of the

federal sentencing guidelines on Native Americans, in 2002 the Sentencing Commission formed

the Ad Hoc Native American Advisory Group (hereinafter "Group"), which included federal

judges, Assistant United States Attorneys, United States Probation Officers, representatives from

the Department of Justice, the Department of the Interior, the United States Commission on Civil

rights, Victim/Witness specialists, private practitioners, academics, and Federal Public Defenders.

REPORT at 11.

         The Advisory Group's Report concluded that, as a result of federal jurisdiction over cases

arising in Indian country, the impact of the federal criminal justice system on Native Americans is

significantly different from its impact on most other Americans.  *Id.* at 8.  Aggravated assaults, in particular, comprise the greatest percentage of offenses prosecuted under the Major Crimes Act. *Id.* at 30.[6]  The Report concluded that federal sentences for aggravated assault are longer than state sentences, and therefore, "because Native Americans are prosecuted federally for assaults, they receive longer sentences than their non-Native counterparts in state court."  *Id.* at iv.[7]  The Advisory Group determined that this state-federal sentencing disparity does not result from an intentional effort by Congress "to target assault because of a unique federal interest or tribal concern" nor does it appear to be "borne of racial animus."  *Id.* at 34.  Rather, the Advisory Group calls this disparity "an accident of history and geography."  *Id.*

To redress the problem, the Group "strongly" advised the Sentencing Commission to reduce the base offense level for aggravated assault by two levels, which it called a "conservative" approach to eliminate the disparity between state and federal sentences.  *Id.* at iv, 34.

In response to the Advisory Group's recommendation, the Commission implemented guideline Amendment Number 663, which lowered the base offense level for Aggravated assault. AMENDMENT 663.  Amendment 663, however, lowered the base offense level by only one rather

---

[6]  "'Native Americans are more likely than any other ethnic group to be incarcerated federally for assault.  While Indians represent less than 2 percent of the U.S. population, they represent about 34 percent of individuals in federal custody for assault."  REPORT at 30-31.  Note that the data relied upon by the Advisory Group are similar to the Sentencing Commission's most recent data.

[7]  The Advisory Group reviewed state court sentencing data from New Mexico and South Dakota, two states with large Indian populations that keep reliable sentencing data.  *Id.* at 31. The average federal sentence was 34 percent higher than the average state assault sentence in South Dakota.  *Id.* at 33-34.  The data showed an even greater disparity in New Mexico:  While the average sentence for assault by an Indian defendant in New Mexico state court was six months, the average sentence for an Indian convicted in federal court in New Mexico is fifty-four months, which constitutes a difference comparable to fifteen guideline offense levels.  *Id.* at 33.

than the "conservative" two-level reduction that the Advisory Group deemed necessary to eliminate the disparity.  *See Id*.  In reality, this one-level reduction to the offense level did not redress the sentencing disparity that Native American defendants face.  In fact, the most recent data from the United States Sentencing Commission indicates that, subsequent to the Amendment, the average sentence for aggravated assault has actually increased.  March 16 2006 U.S.S.C. Data Extract.  The average sentence for defendants sentenced prior to the implementation of Amendment 663 was fifty-one months imprisonment.  *Id*.  After Amendment 663 went into effect, the average sentence was fifty-five months.  *Id*.

The increase in sentence-length may be due in large part to the fact that Amendment 663, while reducing the offense level for aggravated assault, also simultaneously increased all of that guideline's corresponding Special Offense Characteristics for bodily injury.  *See* U.S.S.G. §§ 2A2.2(b)(3)(A)-(E).  *See* AMENDMENT 663.  Federal jurisdiction under the Major Crimes Act extends only to cases of assault that involve bodily injury or use of a dangerous weapon.  *See* 18 U.S.C. § 1153.  Therefore, one or both of the Special Offense Characteristics relating to bodily injury and dangerous weapons will almost always apply to defendants being sentenced for aggravated assault in federal court.  *See* March 16 2006 U.S.S.C. Data Extract.  Sentencing Commission data show that at least one Special Offense Characteristic related to some degree of bodily injury is applied in nearly 70 percent of aggravated assault cases sentenced in federal court.  *See Id*.  Assessment of the Special Offense Characteristic for Serious Bodily Injury raises an offender's offense level by five levels, which increases the base offense level by more than one third.  *See* U.S.S.G. §§ 2A2.2(b)(3)(B).  This is the Special Offense Characteristic most frequently assessed for offenders in this guideline.  *See* March 16 2006 U.S.S.C. Data Extract.

In fact, defendants are often assessed Special Offense Characteristics relating both to bodily injury and to use of a weapon.[8]  As Defendant's case illustrates, the application of these two categories of Special Offense Characteristics significantly increases a defendant's offense level and sentence.  In this case, the assessment of these Special Offense Characteristics raised Defendant's offense level from fourteen to twenty-three, or from a sentencing imprisonment range of fifteen-to-twenty-one months to forty-six to fifty-seven months.  As Defendant's case well illustrates, these high sentences often do not reflect the relative seriousness of the offense.  More often than not, the offense conduct of the defendants who come before me for sentencing for aggravated assault were involved in spontaneous drunken fights and bar brawls.  Note that this Defendant's offense level would be lower if he had killed someone in a drunk driving accident. *See* U.S.S.G. § 2A1.4 (Offense level for involuntary manslaughter is twenty-two if the offense involved reckless operation of a car).

Courts have declined to grant departures solely on the basis of a disparity between state and federal sentences for the same offense, reasoning that the Sentencing Commission's goal of achieving uniformity in federal sentencing would be contravened if district courts were to consider the state sentence for comparable conduct.  *See, e.g., United States v. Searcy*, 132 F.3d 1421, 1422 (11th Cir.1998) (affirming district court's denial of a departure for a state-federal

---

[8]  U.S.S.C. § 2A2.2(b)(2)(A)-(C).  More than 60 percent of aggravated assault offenders are assessed a four-level increase pursuant to § 2A2.2(b)(2)(B) (Dangerous Weapon Otherwise Used).

discrepancy for defendant convicted of a drug offense); *United States v. Deitz*, 991 F.2d 443, 447-448 (8th Cir. 1993); *United States v. Vilchez*, 967 F.2d 1351 (9th Cir.1992).[9]

However, this case arises after *Booker* and U.S.S.G. Amendment 663.  In considering the federal-state sentencing disparity in the case of this Native American defendant sentenced for aggravated assault in the district of New Mexico, I follow the lead of the Sentencing Commission which, by implementing Amendment 663, recognized that this disparity issue bears on the rectitude of a sentence.  This sentencing disparity issue is implicated by several of the sentencing directives set forth at § 3553(a), namely the requirement that a sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.  Different jurisdictions and sovereignties may properly punish the same offenses differently.  Nonetheless, in the case of routine felonies for which Native Americans are sentenced in federal court due to an accident of history and geography, when considering what punishment reflects the seriousness of the offense, promotes respect for the law, provides for just punishment, and avoids unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, it is reasonable to consider what this defendant, who resides in New Mexico, would have faced in New Mexico state court.

While this case well illustrates the recurring problem I confront when sentencing Native American defendants charged with aggravated assault, the issue of state-federal sentencing disparity is not the primary, or even a necessary, consideration for my formulation of Defendant's

_____

[9]  Note that these cases involved defendants charged with drug offenses, an area that Congress has targeted with federal jurisdiction because drug crimes implicate a unique federal interest.  Furthermore, federal jurisdiction over drug offenses does not disproportionately impact Native Americans, or any one group of defendants, due to an accident of history and geography.

sentence.  A sentence of six months of home confinement with electronic monitoring is warranted

chiefly because of Defendant's remarkable character and history, and the unique circumstances of

his offense.

**D.**   **The need to provide the defendant with needed correctional treatment in the most effective manner**

Based on Defendant's family and cultural background, I determined that the sentence best

suited to Defendant is one that provides for treatment in his community, provided by individuals

familiar with Defendant's culture.  In imposing a sentence of home confinement with electronic

monitoring, I note that Defendant and his wife and children reside with Defendant's mother.

Additionally, this sentence will allow Defendant to keep his job, which will allow him to continue

to support his wife and two young children.  This is the rare case where Defendant, at the time of

sentencing, was already living the life that this court and probation work to help all defendants

attain:  He was working two jobs, supporting his family, reporting to his pretrial services officer,

complying with his conditions of release, and providing clean drug tests.  I am convinced that

there is nothing to be gained in the way of deterrence or rehabilitation by incarcerating Defendant.

Finally, a sentence of home confinement with electronic monitoring is indeed punitive.

**E.**   **The need to provide restitution**

I was unable to impose restitution in this case.  The United States Probation Office made

multiple unsuccessful attempts to contact Ricky Jr. for victim impact and restitution information.

Probation enlisted the help of the Window Rock Probation and Parole Services Office, which also

unsuccessfully attempted to contact Ricky Jr. at his residence.  Officers left a message asking

Ricky Jr. to get in touch with the Probation officer, yet despite this outreach, he never provided victim information to the United States Probation office or the United States Attorney's Victim Advocate.  Ricky Jr. was provided written notice of the sentencing hearing yet he did not appear. I did not impose a fine because of Defendant's lack of financial resources.

**F.**   **Advisory Guidelines**

After giving serious consideration to the advisory Guidelines range of thirty-three to forty-one months, I determined that this is a case where the Guidelines clash with the primary directive set forth at § 3553(a):  My obligation to "impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing.  In this case, the guidelines range was greater than necessary to satisfy the purposes of punishment and will not further the objectives of sentencing set forth in § 3553(a).  Accordingly, I determined that the proper sentence is six months home-confinement with electronic monitoring, followed by three years of supervised probation.

In reaching this conclusion, I again must emphasize the unusual and unique nature of this case.  By sentencing Defendant to home confinement with electronic monitoring, I do not intend to minimize Defendant's offense of aggravated assault with a dangerous weapon, nor excuse it. This is a case, however, that calls out for individualized treatment.  "If the Supreme Court's ruling in *Booker* does anything, it gives a defendant hope that where the factors listed in Section 3553(a) warrant a lesser sentence than the Guidelines recommend, and where the Guidelines' goal of uniformity is not advanced, a judge can depart from the sentence recommended by the Guidelines."  *United States v. Perez-Nunez*, 368 F. Supp. 2d 1265, 1270 (D.N.M. 2005).  That is

the case here.  I am convinced that incarceration will be detrimental to all involved and that home confinement with electronic monitoring is a more appropriate sentence.

## CONCLUSION

After considering the Sentencing Guidelines, the *Booker* decision, and 18 U.S.C. § 3553(a), the Court sentenced Defendant to six months home confinement with electronic monitoring followed by three years supervised probation.  For the foregoing reasons, and the reasons stated in open court, this sentence is reasonable under all of the circumstances.  This Opinion and Order shall be appended to Defendant's judgment and commitment form.

It is thereby **ORDERED** that Defendant is sentenced to six months of home confinement with electronic monitoring.

**DATED** this 31st day of May 2006.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorney for the United States</u>:
Presiliano Torrez

<u>Attorney for Defendant</u>:
James Keithley